**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| LISA A. NIGRO, M.S., CRNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:19-cv-03936-TWP-DLP |
| | ) |
| INDIANA UNIVERSITY HEALTH CARE | ) |
| ASSOCIATES, INC., d/b/a INDIANA | ) |
| UNIVERSITY HEALTH PHYSICIANS | ) |
| (I.U.H.P.), | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure by Defendant Indiana University Health Care Associates, Inc., d/b/a Indiana University Health Physicians ("IUHP") (Filing No. 49). Plaintiff Lisa A. Nigro ("Nigro") initiated this action after her employment was terminated, asserting claims of (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), and (3) retaliation (*see* Filing No. 1 at 6–8).  IUHP has moved for summary judgment, arguing that it was entitled to judgment as a matter of law as to all claims (*see* Filing No. 50 at 25–34).  For the reasons discussed below, IUHP's Motion is granted.

**I.    BACKGROUND**

The following facts are not necessarily objectively true; the Court, as required by Federal Rule of Civil Procedure 56, presents them in the light most favorable to Nigro as the non-moving party.  *See Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

After he was hired as the Division Director at the Riley Hospital for Children for the Riley Anesthesia Division ("RAD") in July 2017, Dr. Senthilkumar Sadhasivam ("Dr. Sadhasivam") began working to establish a new care team model at RAD, whereby Certified Registered Nurse Anesthetists ("CRNAs") and Certified Anesthesiologist Assistants ("CAAs") (collectively, "anesthetists"), would work alongside anesthesiologists to provide anesthesiology services (Filing No. 51-8 at 2, 3).  To this end, Dr. Sadhasivam recruited Nigro in late 2017 to join RAD as a CRNA; the two had previously worked well together at a different hospital.  *Id.* at 3.  Nigro and others interviewed for the position with Dr. Robert Presson (Chair of IUHP Anesthesia Department) ("Dr. Presson") and Chanda Prichard (IUHP Vice Chair for Academic and Clinical Administration of Anesthesia) ("Prichard") (Filing No. 51-1 at 4; Filing No. 51-9 at 2, 3).

Nigro is a female and older than forty (40) years of age. She was hired on December 1, 2017 and joined just one other CRNA and a single CAA, understanding that the program would grow over time (Filing No. 51-1 at 7, 8, 10).  Because Riley Hospital is part of Indiana University Health's academic health center, Nigro was also hired as a faculty member of the Indiana University School of Medicine (the "Medical School"), which operates separately from IUHP.  *Id.* at 5.  When she started working for IUHP, Nigro agreed to work and communicate in a professional manner, exhibit care, respect, and courtesy, remain open to receiving feedback, and work as part of a team.  *Id.* at 6, 62.  Nigro also understood that she was required to maintain staff membership at facilities where she worked and clinical privileges consistent with her specialty and as reasonably requested from IUHP periodically.  *Id.* at 6.  On top of this, Nigro knew she was expected to comply with the policies, standards, and regulations promulgated by IUHP and the Medical School.  *Id.*

Approximately one month after Nigro began working for IUHP, Dr. Sadhasivam hired CAA Elizabeth Block ("Block") as Chief Anesthetist for RAD (Filing No. 51-8 at 3).  In this role, Block was to directly supervise all RAD anesthetists and was to report any issues they had to Dr. Sadhasivam (Filing No. 51-2 at 17; Filing No. 51-11 at 2).  Block learned that some anesthesiologists did not want to work with anesthetists, so she strove to build a strong team to ensure confidence in their abilities (Filing No. 51-11 at 3).  On or about February 22, 2018, Dr. Sadhasivam received a complaint from IUHP's Medical Staff Department describing Nigro as "rude, snappy and belittling" in the operating room (Filing No. 51-8 at 3).  Nigro had indicated that she needed the assistance of interventional radiology ("IR") nurses in a tense and stern tone during a patient procedure (Filing No. 53-1 at 3–4).  RAD Clinical Director Jodie Johnson ("Dr. Johnson")—who had been present for the interaction as the attending anesthesiologist and who had felt that the IR nurses were not prepared and were not assisting during the procedure—later counseled Nigro "to be less tense during emergent circumstances." *Id*.  Dr. Johnson acknowledged that it had been "appropriate" for Nigro to request assistance, and that Nigro's tense tone was due to her concern for the patient. *Id*.  After receiving the report, Dr. Sadhasivam responded that he had discussed the matter with Nigro and that he would ensure that she was not rude in her interactions (Filing No. 51-8 at 3).

By the fall of 2018, Dr. Presson (the Anesthesia Department Chair) expressed concern to IUHP's Human Resources department ("HR") that the new care model implemented at RAD was not working well (Filing No. 51-3 at 6).  Acknowledging "murmuring" and "unrest," Dr. Presson asked HR to conduct a review of the model and conduct interviews with the group to understand their concerns and come up with a plan for future success. *Id*.  After determining that it would be beneficial to conduct the review with the Medical School, HR's Vice President Amanda Bates

("Bates") and a doctor from the Medical School took charge of the review (Filing No. 51-9 at 3). Terri Christopher (IUHP Manager of Human Resources) ("Christopher"), the Medical School's Rebekah Bredenbeck ("Bredenbeck"), and Brit Booram ("Booram") conducted interviews with all members of RAD, including anesthesiologists, CRNAs, CAAs, and nurse practitioners. *Id.* Though Nigro was interviewed by Bredenbeck and Booram in October 2018, she does not recall the discussion or any concerns she raised (Filing No. 51-1 at 19). Bredenbeck and Booram did not discuss Nigro's interview with either Dr. Sadhasivam or Christopher (Filing No. 51-8 at 3; Filing No. 51-9 at 3), and Nigro is not sure that anyone from IUHP ultimately knew about anything she shared with these Medical School staff members (Filing No. 51-1 at 48).

In October 2018, Nigro was asked to sign a practice protocol that would permit her to write "drug orders." (Filing No. 51-8 at 4.) Nigro, however, was unsure about signing it because she believed it would be unlawful for CRNAs to independently sign drug orders without an Indiana Controlled Substance Registration and Drug Enforcement Agency Registration. (Filing No. 51-1 at 11). Sometime near the end of October 2018, Nigro met with Dr. Sadhasivam to express her concern. Dr. Sadhasivam informed Nigro that signing the protocol was a requirement and that her failure to do so could lead to her losing her position with IUHP. *Id.* at 11–12. Yet Dr. Sadhasivam did not force Nigro to sign the protocol at that time and allowed her additional time to research the issue (Filing No. 51-8 at 4). Following this meeting, Nigro met with Christopher and IUHP's Chief Nursing Officer Melissa Hockaday ("Hockaday"), expressing that she felt she was being "threatened to do something that could ruin [her] career" and that she was told she would lose her job with IUHP if she did not sign (Filing No. 51-1 at 12; Filing No. 51-10 at 2). After assuring Nigro that she would look into the issue, Hockaday sent Nigro information concerning her

apprehensions from the American Association of Nurse Anesthetists website, as well as state law and federal regulations (Filing No. 51-10 at 3).

Nigro was not alone in her concerns. Anesthesiologist Dr. Morton Green ("Dr. Green") expressed skepticism concerning the new protocol, questioning whether anesthetists, who do not have "prescriptive authority" under pertinent Indiana statutory authority, could legally write "drug orders" pursuant to guidance from the Indiana Medical Licensing Board and Indiana Pharmacy Board (Filing No. 58-3 at 4). Eventually—after he contacted the Drug Enforcement Agency with his continued concerns—Dr. Green signed an updated protocol that, in essence, required anesthesiologists to verbally provide orders to anesthetists. *Id.* at 4–5. Dr. Green faced no threats or workplace repercussions for his forceful questioning of the protocol. *Id.* at 5.

By November 13, 2018, every anesthetist but Nigro—who had yet to provide any information to support her reticence—had signed the practice protocol (Filing No. 51-8 at 4). Nigro was asked to meet with Dr. Sadhasivam and Prichard (Filing No. 51-1 at 70). Before this meeting, she told Christopher that she believed it was "obvious that I will be forced to sign the paperwork." *Id.* Christopher responded by offering to request that Dr. Sadhasivam and Prichard cancel the meeting. *Id.* She also told Nigro that she could ask to bring in someone from HR, or Hockaday, to discuss her concerns. *Id.*

In response, Nigro requested that Christopher "[p]lease intervene" and that she "would like someone present during a meeting" because they had not "disclose[d] what [the] meeting [was] about." *Id.* Nigro expressed that she "and other anesthesiologists feel threatened and the workplace is becoming increasingly hostile. My stomach is in knots right now." *Id.* The environment had become "hostile," Nigro explained, and individuals there "talk about other people" and "speak badly about them." *Id.* at 14. Since IUHP "took over," Nigro insisted, it would

"tear anybody down" who worked there.  *Id.*  Nigro, however, never complained to leadership about male anesthetists doing less than her (Filing No. 51-1 at 52).  Christopher, in turn, reached out to Dr. Sadhasivam and Prichard, explaining that Nigro was "concerned that she will lose her job if she does not sign that document." (Filing No. 51-8 at 17.)  Dr. Sadhasivam, however, informed Christopher that though Nigro had not yet provided support for her unease despite his requesting backing, he had neither forced her to sign the protocol nor told her that she would lose her job if she did not sign it.  *Id.*  Though Block emailed Nigro that day to see if her concern had been addressed, Nigro never responded because by that time she had decided to sign the protocol—she had been unable to find anything "either way" on the issue (Filing No. 51-1 at 15–16, 71).

The next day, November 14, 2018, Nigro met with Dr. Sadhasivam, who shared that HR had informed him that Nigro said Dr. Sadhasivam told her that she would be fired if she did not sign the protocol.  *Id.* at 17.  Nigro agreed to correct this statement with HR after Dr. Sadhasivam told her he felt it compromised his integrity, agreeing that signing the protocol was a requirement for her position.  *Id.*  Before the meeting ended, Nigro  told Dr. Sadhasivam that she liked him and his leadership but thought that Block—who Nigro believed got along well with Dr. Sadhasivam—was causing tension among the anesthetists.  *Id.* at 18, 53.  Nigro signed the protocol during the meeting and, the next day, on November 15, 2018, she emailed Christopher to clarify that Dr. Sadhasivam had never used the word "fire" when describing the consequences of her refusal to sign the protocol.  *Id.* at 16, 72.  Nigro, however, maintains that she only sent this email because of pressure she felt to "appease" Dr. Sadhasivam (Filing No. 53-8 at 65).

Meanwhile, the investigation into RAD's operations under Dr. Sadhasivam continued. Over the course of her interviews, Christopher heard complaints from both women and men about Dr. Sadhasivam (Filing No. 51-9 at 3).  Specifically, three female doctors—Dr. Leigh Latham

("Dr. Latham"), Dr. Johnson, and Dr. Doris Hardacker ("Dr. Hardacker")—complained that Dr. Sadhasivam generally treated men better than women and that the women had targets on their backs (*see* Filing No. 54-2 at 8–12).[1] Anesthesiologist Michael Acquaviva ("Dr. Acquaviva") felt the RAD environment was "tense" when led by Dr. Sadhasivam (Filing No. 51-6 at 6). Christopher concluded that the "team as a whole" was concerned about how they "were all treated." (Filing No. 51-3 at 11.) Though Christopher acknowledged there was some "belief that women are treated differently than men," she judged that all employees held "equal belief" that there were issues at RAD. *Id.* Dr. Sadhasivam, for his part, had complained about both male and female RAD workers. *Id.* at 15. On January 16, 2019, Nigro attended a meeting to examine the results of the HR review (Filing No. 51-1 at 19). At this meeting, four areas of concern emerged: (1) the care team model, (2) contract/job security, (3) change management, and (4) trust and team dynamics. *Id.* at 77. After this review, IUHP brought in a consultant to work with RAD. *Id.* at 21.

A few weeks later, on January 30, 2019, Dr. Presson placed Dr. Sadhasivam on a performance improvement plan ("PIP") (*see* Filing No. 51-2 at 39–41). The PIP was deemed necessary because of "low" morale, "high" conflict, and the "lack[]" of "the spirit of teamwork" in RAD. *Id.* at 39. Recognizing the need for leadership growth, the PIP contemplated that Dr. Sadhasivam needed to work on maintaining positive relationships, listening to others in a non-defensive way, communicating in an appropriate tone, receiving feedback, and accepting decisions made by others. *Id.* at 39–40. Dr. Sadhasivam knew that some anesthesiologists felt he could be rude, unprofessional, harsh, defensive, and intimidating, and the PIP documented that he could "often come[] across as unnecessarily harsh and dictatorial." *Id.* at 5, 8, 40.

---

[1] Separately, Dr. Johnson had heard from individuals in leadership at IUHP that Dr. Sadhasivam had issues with women (*see* Filing No. 53-1 at 3). Moreover, then-Director of Pediatric Surgery at Riley Hospital Dr. Frederick Rescorla ("Dr. Rescorla") sent an email to Medical School's dean informing him that RAD was experiencing widespread incidents of "harassment, gender-based discrimination, bullying and retaliation." (Filing No. 53-11 at 4.)

In the meantime, Nigro's conduct caused continued concern for Dr. Sadhasivam during 2018 and early 2019 (*see* Filing No. 51-1 at 93–94). In July 2018, Dr. Rescorla reported that Nigro had failed to immediately inform the attending anesthesiologist that a patient had been hypotensive (suffering from low blood pressure), and ultimately—for the first time in thirty years at IUHP—he filed an incident report (Filing No. 51-4 at 3, 4). Additionally, Dr. Rescorla had reported that all anesthetists could talk too much and could be inattentive in the operating room (Filing No. 51-1 at 93; Filing No. 51-4 at 6; Filing No. 51-2 at 12–13; Filing No. 53-6 at 11). But Dr. Rescorla, while noting that Nigro could become "flustered if things were kind of complicated or difficult," did not recall any other specific complaints he had about her, though "somebody might recall a time when [he had] complained about her." (Filing No. 53-6 at 10–11.)

On an interpersonal level, though Nigro was always invited to social gatherings of anesthetists, she never attended (Filing No. 51-1 at 44). Instead, Nigro investigated all of her coworkers online, where she found information on a male RAD CAA ("CAA 1")[2] that caused her to believe he had a history of alcohol problems (though she did not know about any instances of this affecting his work at RAD). *Id.* at 45, 46. Specifically, Nigro discovered information on the internet about a meeting he attended with the medical board and the requirement that he go through a treatment plan for his licensure. *Id.* at 45. Nigro, however, never told anyone at IUHP that she found this information. *Id.* at 46. RAD anesthesiologist Stacy Kritzmire ("Dr. Kritzmire") had complained about CAA 1's alertness and ability to function as she found him "slumped over in a chair and disoriented" during a procedure, and he had "laughed inappropriately" when asked to correct a critical error, and he was "stumbling as he was standing" (Filing No. 58-4 at 5). However,

---

[2] Due to the sensitive nature of the facts concerning this CAA, the Court is genericizing his identity. Though Nigro extensively details CAA 1's history surrounding substance abuse and treatment, the Court does not find this chronicle important for comparator's sake.

Kritzmire did not immediately report her concern, it was not made in writing, it was not a formal complaint, it was never validated, CAA 1 was never disciplined, and it occurred after Nigro's ultimate termination (Filing No. 51-3 at 16). And according to Dr. Green, CAA 1 did not appropriately monitor patients and was more interested in attending to his cell phone (Filing No. 58-3 at 3). This unconcerned approach—paired with a "hostile and unprofessional" attitude—caused Dr. Green to request to never work with CAA 1. *Id.*

By November 2018, Nigro started covertly recording meetings at work (Filing No. 51-1 at 16–17). When Block found out about this practice, she felt Nigro could not be trusted (Filing No. 51-11 at 9). Nigro also filed an incident report—which usually are reserved for interdepartmental use—against RAD CAA Jennifer Rush ("CAA Rush") for unprofessional behavior (falsely telling Nigro that a doctor was looking for her) and "policing" Nigro's location (Filing No. 51-2 at 19; Filing No. 51-8 at 5). Dr. Sadhasivam and Block were not especially concerned with this incident report because of its seemingly trivial nature and the fact that Nigro apparently disliked CAA Rush, though Nigro later asserted that she "had no problem with" her (Filing No. 51-2 at 19; Filing No. 51-11 at 3; Filing No. 53-8 at 27). Moreover, Nigro told Dr. Johnson (the RAD Clinical Director) that she had heard that CAA 1 was terminated from his previous employment for "huffing" nitrous oxide at work (Filing No. 51-1 at 25; Filing No. 53-1 at 3). Dr. Johnson—who had heard the same thing—then directed Nigro to inform Dr. Sadhasivam of this information, which she did due to her concern for patient and staff safety. *Id.* Additionally, Nigro informed Dr. Sadhasivam that she had found a syringe of fentanyl (a synthetic opioid that is similar to, but much more powerful than, morphine) that CAA 1 was supposed to "waste." (Filing No. 51-1 at 26.) Though Nigro told Dr. Sadhasivam that the attending anesthesiologist Dr. Eugene Presto ("Dr. Presto") had told her that he had ordered the waste with CAA 1 (but did not

9

see him complete it), Dr. Presto did not recall that event, and Dr. Sadhasivam's follow-up investigation of Nigro's otherwise "appropriate" report revealed that the pharmacy did not identify any discrepancy with the fentanyl.  *Id.*; Filing No. 51-5 at 4; Filing No. 51-2 at 17; Filing No. 53-10 at 19.

Block also reported problematic behavior on the part of Nigro to Dr. Sadhasivam.  First, although Block maintains that she had informed Nigro that she could have a day off work, Nigro, in front of other anesthetists, told Dr. Johnson that Block had refused her request because Nigro did not have children (Filing No. 51-11 at 3).  Block believes this was done to undermine her in front of Dr. Johnson, though Nigro continues to insist that Block indicated only Block could have time off.  *Id.*; Filing No. 51-1 at 27.  Nigro also notified Dr. Johnson that RAD CRNA Krysta Merritt ("CRNA Merritt") had complained to Nigro about working with a particular anesthesiologist (Filing No. 51-11 at 4).  CRNA Merritt expressed frustration to Block, however, that Nigro had gone straight to Dr. Johnson (Nigro maintains that she received CRNA Merritt's permission to speak with Dr. Johnson), and Block felt Nigro should have come to her directly instead. *Id.*; Filing No. 53-4 at 2. Finally, after Block told anesthetists that they would not be assigned to certain anesthesiologists, Nigro told two anesthesiologists that she was fine working with any of them, which Block felt undermined her authority and showed Nigro attempting to curry individual favor with anesthesiologists (Filing No. 51-11 at 4). Nigro, however, maintains that she only offered help directly in an effort to accommodate the needs of the schedule (Filing No. 51-1 at 28). One of the two anesthesiologists, for her part, at some point told Nigro that "I think the anesthetists have it out for you." *Id.* at 49–50.

On January 24, 2019, Dr. Sadhasivam emailed RAD Practice Administrator Bryan Ooley ("Ooley") to express concern about Nigro's behavior (Filing No. 51-8 at 5). At this point, Dr.

Sadhasivam felt termination was an appropriate next step. *Id.* at 20. Ooley, Hockaday (the Chief Nursing Officer), Block, and Dr. Sadhasivam then started investigating the facts causing concern (Filing No. 51-3 at 13). During the investigation, Block forwarded to Dr. Sadhasivam an email from CRNA Merritt detailing an incident that occurred a few days earlier on February 5, 2019, involving Nigro questioning Dr. Acquaviva's decisions during a procedure (Filing No. 51-8 at 22–23). Dr. Acquaviva—at Dr. Sadhasivam's request (Filing No. 53-9 at 7)—later sent an email explaining to Dr. Sadhasivam that Nigro had looked at him with "utter shock and disbelief" when he outlined his plan for airway management of a patient (Filing No. 51-8 at 24). Yet Dr. Acquaviva felt that the incident was "uneventful," and he immediately moved on from it (Filing No. 53-9 at 6–7). Indeed, it was "shocking" to him that he was asked to write about the event. *Id.* at 6.

Moreover, Dr. Acquaviva felt that Dr. Sadhasivam was perhaps attempting to inflame his emotions by telling him that Nigro had said "bad things about" him and had been "complaining about" him. *Id.* Additionally, Block indicated to Dr. Sadhasivam that Dr. Acquaviva had told her that Nigro had yelled at him and other staff and that Dr. Acquaviva would be sending a follow-up email. However, Dr. Acquaviva denied that Nigro ever raised her voice during the procedure and denied saying that he would send any narrative accounting of the events (Filing No. 51-8 at 22; Filing No. 53-9 at 5). Dr. Presto, who took over anesthesiology duties for Dr. Acquaviva during the procedure, told Dr. Sadhasivam that Nigro had asked him during the "changeover" if he wanted to modify "the existing airway." (Filing No. 51-8 at 26.) But according to Dr. Presto, "[i]t did not appear that [] Nigro was overly affected or emotional about this decision in the IR suite." *Id.* Dr. Sadhasivam, however, felt this conduct both exceeded Nigro's authority (by questioning a superior) and undermined Dr. Acquaviva to Dr. Presto, undercutting the collaborative environment Dr. Sadhasivam was trying to create (Filing No. 51-2 at 30). In contrast, Drs. Johnson, Green, and

Kritzmire felt that Nigro was a courteous, well-prepared, anesthetist whose patient care ranked among the best ([Filing No. 53-1 at 4](#); [Filing No. 58-3 at 2](#)–3; [Filing No. 58-4 at 5](#)).

On February 12, 2019—after reviewing all the information provided, and at Christopher's suggestion—Dr. Sadhasivam, Christopher, Hockaday, Block and Ooley met with Nigro to deliver a Coaching Memorandum ([Filing No. 51-8 at 6](#); [Filing No. 51-9 at 4](#)).   In the meeting, Nigro was informed that her behavior, paired with clinical concerns, destabilized RAD's working environment ([Filing No. 51-1 at 31](#)).   At the end of the meeting, Dr. Sadhasivam provided Nigro, who acknowledged the need to show improvement or face sanctions, with a copy of the Coaching Memorandum, which she signed.  *Id.*  As a result of the Coaching Memorandum, Nigro neither received a pay cut nor lost any responsibilities or privileges.  *Id.* at 31–32.  Though Dr. Sadhasivam told Nigro that he wanted her to succeed on the team in a follow-up email, he never discussed the Coaching Memorandum with Nigro after the meeting or that email.  *Id.* at 32.

The next month, on March 25, 2019, Dr. Sadhasivam emailed Christopher with three new concerns about Nigro ([Filing No. 51-8 at 6](#)).  First, Dr. Sadhasivam reported that he had learned that Nigro told attending anesthesiologist Dr. Julie Dunlap ("Dr. Dunlap") that "[i]f you do not intubate the patient in 10 seconds, I am going to take over" on March 15, 2019.  *Id.* at 7.  Because she and Nigro had a "good professional working relationship," Dr. Dunlap interpreted the comment as being made in a joking manner and was not offended by it ([Filing No. 53-7 at 5](#), 6).  Dr. Sadhasivam and Dr. Presson spoke with Dr. Dunlap and established that even if the comment were made in jest, it still undermined Dr. Dunlap ([Filing No. 51-8 at 6](#)).  Second, Dr. Sadhasivam conveyed that he found out that Nigro had set off the metal detector in the MRI scan room on March 8, 2019, when she inadvertently wore her watch into the room.  *Id.*; [Filing No. 53-8 at 35](#).  Though others had mistakenly set off the alarm too, ([Filing No. 53-4 at 2](#)), Dr. Sadhasivam and

Block ultimately determined that Nigro's disturbance created a safety concern and was disrespectful to the MRI technician, who had been trying to ensure Nigro did not bring unsafe items into the room (Filing No. 51-8 at 8, 33).  A doctor spoke with Nigro about the disruptions, and he and Block sent emails to the anesthetists asking for them to be more mindful of their conduct in the MRI scan room (Filing No. 51-1 at 35–36, 96, 97).  Third, Block told Dr. Sadhasivam that some of the other anesthetists believed Nigro was flouting the system created to allow late-working anesthetists to leave first the next day by recording later release times (Filing No. 51-8 at 8; Filing No. 53-1 at 5).  Upon researching the issue, Block discovered that on several dates, Nigro or a staffer did not record her release time, so Block was unable to account for all of the dates to ultimately determine whether there was a discrepancy (Filing No. 51-8 at 42).  Dr. Sadhasivam, however, ruled out release time discrepancies other than that for March 7, 2019. *Id.* at 8. For her part, Dr. Johnson indicated that she never experienced time-recording issues with Nigro and that Nigro was oftentimes "the first anesthetist to arrive" and "the last to leave." (Filing No. 53-1 at 5.)

Approximately two weeks later, on April 9, 2019, Dr. Sadhasivam reached out to Christopher with these new concerns, inquiring about potential next steps. *Id.* Christopher felt alarm that Nigro continued to have behavioral issues so shortly after the meeting and delivery of the Coaching Memorandum (Filing No. 51-9 at 4). Christopher contacted Hockaday for advice, who suggested either an additional formal meeting with Nigro outlining specific timelines for correction or termination founded on the MRI scan room incidents. *Id.* at 4–5, 15. The next day, April 10, 2019, Christopher responded that no matter the course, she did not expect Nigro to take the feedback well, and the team would need to determine "appropriate action and next steps" for her. *Id.* at 5, 19. Dr. Sadhasivam then drafted a 90-day notice of termination that he sent along to HR for edits, including Block on the email. *Id.* at 5, 18. Christopher also reached out to Bates (her

boss), letting her know that Nigro was behaving problematically again and indicating that IUHP should perhaps end her employment instead of attempting additional remedial measures. *Id.* at 5, 18. The day after that, on April 11, 2019, Block told Dr. Sadhasivam that she received three additional complaints about Nigro's time reporting (Filing No. 51-9 at 23). According to Block, the entire anesthetist team had lost faith in Nigro and felt she could not be trusted or relied upon. *Id.* Indeed, Block indicated that the team felt Nigro operated under her own set of rules and that they were expected to pick up her slack. *Id.* Dr. Sadhasivam then directed Block to investigate the new time discrepancies, while he told Nigro to look into the March 7, 2019 discrepancy through the computer system. *Id.* at 22; Filing No. 51-8 at 9.

On April 14, 2019, a Sunday, Nigro emailed Christopher and Hockaday, stating that the "situation" at RAD had "worsened": she was now a "target" and was "being harassed." (Filing No. 51-1 at 98.) Nigro believed the root of the "he said/she said" environment was Block, who would not inform Nigro of who told her about the time discrepancies. *Id.* Nigro expressed that looking into the system for her release time would violate IUHP policies and that she was not permitted to leave first, whereas other anesthetists were. *Id.* Nigro later explained, however, that a male CAA was also frustrated at one point that he was not allowed to leave first either. *Id.* at 39. Finally, Nigro asked how to file a formal complaint. *Id.* at 98. The next day, April 15, 2019, Dr. Sadhasivam confirmed to Christopher that Nigro did not perform clinical work while she was on the clock on March 7, 2019 (Filing No. 51-8 at 9, 47). The attending anesthesiologist did not tell Nigro to go home, but instead to take a break, which Dr. Sadhasivam believed was favoritism for her. *Id.* at 9. Even though he was still waiting to hear back from Nigro about a time discrepancy from April 4, 2019, Dr. Sadhasivam concluded that the time-release concerns were "weak" and standing alone would not support termination. *Id.* at 9, 47. But as he told Christopher, "it is more

14

than that." *Id.* at 10, 47. Ultimately, Dr. Sadhasivam, Hockaday, Bates, Christopher, and Prichard agreed that Nigro's employment should be terminated.  *Id.* at 10; Filing No. 51-3 at 4.

A day later, on April 16, 2019, Nigro again emailed Christopher and Hockaday (after neither had replied to her April 14 email), informing them that she had found out Dr. Sadhasivam was "building a case to get rid of me." (Filing No. 51-1 at 99.) She also indicated that she needed "some advice on how to proceed" and that she needed "to talk to someone today." *Id.* If they were not the appropriate people, Nigro requested that they let her know who to contact.  *Id.*  Later that same day, Christopher—who apologized for the delay in responding—asked to schedule a time to meet with Nigro, including Hockaday on the email.  *Id.*  Two days later, on April 18, 2019, Nigro responded that she understood the delay and that it had been busy at RAD as well (Filing No. 51-9 at 29). She indicated that she would be with family for Easter but that they should "see what we can work out next week." *Id.* Nigro, however, never followed up and never contacted anyone at HR again (Filing No. 51-1 at 40, 44).

On April 29, 2019, an affidavit Nigro had signed was filed in *Sandra Kinsella, M.D. v. Indiana University Health Care Associates, Inc.*, Case No. 1:16-cv-02252-JMS-MPB, though Nigro had never worked with Dr. Sandra Kinsella ("Dr. Kinsella"), *id.* at 46–47, and Dr. Kinsella never worked at RAD or with Dr. Sadhasivam (Filing No. 51-9 at 8). This affidavit stated that "During the course of my employment at IUHP, I have been the subject of gender and age discrimination. Additionally, I have been the subject of retaliation for making and/or filing complaints of discrimination." (Filing No. 51-1 at 100.)  To this affidavit, Nigro attached a copy of a February 12, 2019 inquiry she had made to the Equal Employment Opportunity Commission ("EEOC"). *See id.* at 103–05.  Nigro had not yet filed a Charge with the EEOC and never told anyone at IUHP that she had contacted the EEOC in any capacity. *Id.* at 43, 47. At that time, Nigro

believed she had been retaliated against because she "said things" at the "HR meeting." *Id.* at 46. Nigro disclosed, however, that she submitted the affidavit to "get in a protected status, hoping that things would slack off and they would get off my back." *Id.* at 52. In the end, no one at IUHP ever said anything about the affidavit to Nigro, she is not sure who at IUHP saw it, and Dr. Sadhasivam did not know it existed during Nigro's employment. *Id.* at 52, 54; Filing No. 51-8 at 10. Moreover, Nigro never told any IUHP leader or HR that she had experienced either age or sex discrimination (Filing No. 51-1 at 44).

A few months later, on June 24, 2019, Prichard and Hockaday met with Nigro and informed her that her employment would terminate without cause ninety days later on September 22, 2019, consistent with the terms of her contract with IUHP (Filing No. 51-10 at 6, 7; Filing No. 51-1 at 64, 69 (indicating in letter delivered to Nigro at the meeting that IUHP "has decided to terminate your Employment Agreement without cause")). During this meeting, Nigro indicated that she was being terminated because people "don't like me" and that "your VP is the people [sic] who wanted me to come here." (Filing No. 51-10 at 7.) Indeed, at various times, Nigro believed Dr. Sadhasivam, Block, and CAA Rush were trying to get her terminated (Filing No. 51-1 at 42). Though June 24, 2019, was her last day of work, Nigro remained in IUHP's employ until her termination date. *Id.* at 69. Later, Nigro contended that IUHP did not help her provide information to potential future employers but subsequently said she was "on the verge" of not being offered one of the jobs and had been offered the other. *Id.* at 57. In his capacity, Dr. Sadhasivam was never involved in any records requests (Filing No. 51-8 at 10). Eventually, on September 17, 2019, Nigro filed this action, alleging that IUHP discriminated against her in violation of Title VII and the ADEA and retaliated against her in violation of Title VII (*see* Filing No. 1 at 6–8). On

November 13, 2020, IUHP, under Federal Rule of Civil Procedure 56, moved for summary judgment on all claims brought against it (*see* Filing No. 49).

## II.  LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation

marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties

nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir.

1997) (citations and quotation marks omitted).

## III.   DISCUSSION

At the outset, the Court notes that Nigro concedes she "has not responded to IUHP's age

discrimination argument and abandons that claim." (Filing No. 52 at 1.) The Court, then, need only

examine her claims regarding sex discrimination and retaliation under Title VII, which it does

below after addressing Nigro's Motion for Leave to File a Surreply Brief.

### A.   Nigro's Motion for Leave to File a Surreply Brief and Corrected Affidavits

In its reply brief supporting summary judgment, IUHP maintains that

> Nigro's declarations are replete with deficiencies. First, [Dr.] Kritzmire's
> declaration, and each of Nigro's declarations, suffer from the same substantive flaw:
> they lack the language required by 28 U.S.C. §1746, specifically that the foregoing
> information provided is "true and correct." Nigro's declarations state merely that
> such information is "true." The Mark Waterfill declaration does not even contain
> the "true" language. *See Szany v. Garcia*, Case No. 2:17-CV-74-PPS-JPK, 2020
> WL 2767356, at *8–9 (N.D. Ind. May 28, 2020) (compliance with 28 U.S.C. §1746
> is "mandatory and fundamental, not a 'non-substantive' requirement"). [Dr.]
> Kritzmire's declaration, in addition, is "signed" using only a typed signature, and
> thus is "unsigned" for purposes of this Court's rules, and should also be disregarded.
> *See* S.D. Ind. L.R. 5-7(b) (signature on a document other than a document signed
> pursuant to subsection (a) (Fed. R. Civ. P. 5(d)(3)(C)) must be an original
> handwritten signature and must be scanned into .pdf format for electronic filing).
> The declaration provided by [Dr. Green] has no signature at all, and thus is also
> deficient and must be disregarded. As stated herein, Nigro's declarations fail to
> provide admissible evidence on the issues for which she presents them, and can be
> stricken on that basis as well.

(Filing No. 57 at 3 n.2) (citations to the record omitted). IUHP also contends that "Nigro cites to

[Dr.] Green's unsigned declaration," but this "declaration does not contain the cited Paragraph."

*Id.* at 12 n.3. Additionally, IUHP argues some evidence constitutes inadmissible hearsay:

testimony of Christopher summarizing statements made to her by Drs. Kritzmire, Johnson, and Latham, *id.* at 9, 10, as well as an email sent by Dr. Rescorla recalling statements made by anesthesiologist Dr. Hardacker, *id.* at 10–11.  Finally, IUHP argues that because "Nigro has failed to identify any evidence that either [Dr.] Sadhasivam or Block did not honestly believe all (or at least one of) the reasons given for Nigro's termination," the Court should disregard "reputation" statements since "'discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by affidavits speculating about the defendant's motives.'" *Id.* at 12 (quoting *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)).

Nigro requests leave to file a surreply brief and corrected affidavits (Filing No. 58).  The "purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 WL 1258052, at *2 (S.D. Ind. Mar. 25, 2010).  "New arguments and evidence may not be raised for the first time in a reply brief.  Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) (citations omitted). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

Nigro points out that "IUHP raised multiple objections to the admissibility of plaintiff's designated evidence and also objected to the admissibility in plaintiff's declarations." (Filing No. 58 at 1.) She argues the Court should permit her to file her surreply brief because it "is limited to only addressing IUHP's objections to the admissibility of evidence and plaintiff's declarations" and

allow her to file the corrected affidavits of Dr. Green, Dr. Kritzmire, and Attorney Mark Waterfill ("Attorney Waterfill") as well as a declaration of Marjorie Dishon (a legal assistant) that explains a filing error.  *Id.* at 1–2.

In response, IUHP partially objects (Filing No. 59).  While recognizing that the submission of Nigro's Surreply Brief "is permitted by local rule," IUHP maintains that the submitted corrected declarations are "untimely" and that Dr. Green's corrected declaration "includes an unexplained substantive change."  *Id.* at 1–2.  Indeed, IUHP notes that the paragraph now added to Dr. Green's declaration "was cited in Plaintiff's response, but missing from Dr. Green's declaration," as observed in IUHP's reply brief.  *Id.* at 2.

Upon careful review of the filing, the Court concludes that Nigro's tendered surreply complies with the local rules because it addresses challenges to the admissibility of evidence relied upon in her response brief (*see* Filing No. 58-1).  To that extent, the Court **grants** Nigro's Motion.

The Court will also permit Nigro to correct the Attorney Waterfill, Dr. Green, and Dr. Kritzmire affidavits by appending or correcting their missing signatures.  The filing of the Attorney Waterfill and Dr. Green affidavits without their signatures was an inadvertent mistake (*see* Filing No. 58-1 at 6, 7; Filing No. 58-2 at 2–3), and courts generally prefer to base decisions on the merits of a case, rather than mere technicalities. *See Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is . . . entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities."); *see also Woods v. Ind. Univ.-Purdue Univ.*, 996 F.2d 880, 884 (7th Cir. 1993) ("dispositive decisions should be based on the merits rather than technicalities"); *Ballard v. Wilderness Resort Hotel & Golf Resort*, No. 14 C 00841, 2014 WL 3811003, at *1, *2 n. 4 (N.D. Ill. Aug. 1, 2014) (determining that an affidavit that did not provide a date of execution as required by 28 U.S.C. § 1746 may be considered by the

Court on a motion to remand because "'decisions on the merits are not to be avoided on the basis of mere technicalities'") (quoting *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986)). And while Dr. Kritzmire's affidavit was originally filed with an electronic signature (Filing No. 53-3 at 7), her corrected affidavit is now inscribed with a physical signature (Filing No. 58-4 at 7).

Moreover, IUHP will not be prejudiced if the Court were to consider the corrected affidavits: while the corrections add physical or unintentionally omitted signatures to the exhibits, the affidavits contain largely identical substantive information.[3]  IUHP's reply brief addresses the substance of the affidavits at length (*see* Filing No. 57 *passim*). The Court, then, will consider the evidence presented in the corrected declarations of Attorney Waterfill, Dr. Green, and Dr. Kritzmire when evaluating IUHP's Motion.[4] The Court, however, will address the remaining contentions—that statements in Christopher's declaration and Dr. Rescorla's email are hearsay and that statements about Dr. Sadhasivam's and Block's truthfulness should be disregarded—as they become germane to this Entry.

**B.**     **Sex Discrimination under Title VII**

Nigro alleges that she "was terminated from her employment at [IUHP] as a result of her gender." (Filing No. 1 at 6.) "In discrimination cases, '[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity,

---

[3] As for the paragraph "added" to Dr. Green's affidavit, it concerns a matter (Dr. Sadhasivam's trustworthiness)—supported by two other affidavits—about which IUHP had notice (*see* Filing No. 52 at 3) and replied (*see* Filing No. 57 at 12, 12 n.3). Additionally, the corrected affidavits now declare that their statements are "true and correct" (*see* Filing No. 58-3 at 6; Filing No. 58-4 at 6; Filing No. 58-5 at 2), resolving another of IUHP's objections (*see* Filing No. 57 at 12 n.3). In regard to this argument as it pertains to Nigro's declaration, 28 U.S.C. § 1746 instructs that the writing's affirmation "substantially" track the provided examples. Though the statute uses the redundant "true and correct," Nigro's declaration "substantially" tracks that duplicative language by using merely "true."

[4] The Court does not fault IUHP for making its arguments. Deadlines are important and complying with "technicalities" is required. Nigro's counsel is admonished to exercise care in filing supporting exhibits in this Court.

sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citing *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

"One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 . . . (1973)," which "requires a plaintiff to make a prima facie case of discrimination"—that is, that "(1) [she] belongs to a protected class; (2) [she] met [her] employer's legitimate expectations; (3) [she] suffered an adverse employment action; and (4) another similarly situated employee outside of [her] protected class received better treatment from [her] employer." *Id.* (citing *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020)).  Once this *prima facie* case is made, "'the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.'" *Id.* (quoting *Purtue*, 963 F.3d at 601–02). "But a plaintiff need not use the *McDonnell Douglas* framework after *Ortiz* [*v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)]," which instructs that "[t]he determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Id.* (citing *Ortiz*, 834 F.3d at 765).

IUHP contends that Nigro cannot make a *prima facie* case of sex discrimination under *McDonnell Douglas* because she "admits [a] male CAA . . . also did not get to leave early on a day when he expected to do so."  (Filing No. 50 at 29–30.)  As for Dr. Green—who Nigro claims, unlike her, was "not threatened" when *he* refused to sign the practice protocol involving anesthetists signing perioperative drug orders—IUHP argues he not similarly situated. As an anesthesiologist, Dr. Green has supervising responsibility over [anesthetists] such as Nigro.

Finally, "Nigro, as an anesthetist, did not follow up with [Dr.] Sadhasivam about the protocol, and provided no documentation of why she would not move forward" with signing the protocol. *Id.* at 30. Moreover, she cannot establish pretext when "[c]omplaints about Nigro arose from all sides— not solicited by [Dr.] Sadhasivam—and others were actively engaged in gathering more information about the concerns." *Id.*

In response, Nigro argues that she has established a *prima facie* case ([Filing No. 52 at 23](#)). First, "[i]t is undisputed [she] is a female and she suffered an adverse employment action as a result of her termination without cause on June 24, 2019," and she has presented "evidence she performed reasonably well." *Id.* Indeed, Nigro's "supervising anesthesiologists assessed [her] performance and behavior as the top performer among her fellow anesthetists." *Id.* Moreover, Nigro contends that the male CAA "was clearly treated more favorably" despite his significant personal impediments and workplace shortcomings. *Id.* at 24. And Dr. Green serves as an appropriate comparator when he too was "required to approve and sign the protocols," and different job titles do not distinguish comparators "when they are subject to a general workplace rule." *Id.* at 25. Nigro argues that she was threatened with termination upon refusing to sign the protocol, and Dr. Green was treated dissimilarly and treated more favorably upon his refusing to sign the protocol. *Id.*

As for pretext, Nigro contends "[m]any of IUHP's reasons for termination are inaccurate." *Id.* For example, she "did not falsely report that [Dr. Sadhasivam] threatened she would be unable to work at IUHP if she did not sign the protocol." *Id.* In fact, she argues, IUHP "admits" that he "made the statement." *Id.* (emphasis in original). Additionally, the argument that she "was leaving Riley [Hospital] early without permission is weak and unsupported by the evidence." *Id.* at 26. Nigro contends the evidence shows that she "was the first to arrive and the last to leave Riley" Hospital. *Id.* at 26. Moreover, "complaints" about her conduct are unfounded when some doctors

"did not find a problem" with her behavior, and she "was providing appropriate care to the patient and needed assistance from the IR nurses" when she asked for help in a "stern voice". *Id.* Furthermore, Block's complaint that Nigro ignored her authority and also lied about not receiving permission for a vacation day is merely an allegation which she strongly denies. Block's credibility is undergirded by the fact "that Block has a reputation for not telling the truth." *Id.* Also, Nigro's "complaint against [CAA] Rush was legitimate and there is evidence [CAA] Rush was engaged in horse play by paging [Nigro] to come see [a doctor] when [CAA] Rush had not heard from [that doctor] for an hour." *Id.* And because Nigro only approached "Dr. Johnson about [CRNA] Merritt's scheduling with" a specific doctor at the "behest of [CRNA] Merritt," that issue was trivial. *Id.* at 27.

Nigro adds that "the MRI issues are diminished when [she] set off the MRI alarm [in isolation] and are not particular as to her, since many others at Riley [Hospital] trip the alarm because they have metal." *Id.* Nigro contends that IUHP's reasons for termination "lose even more credibility" when they were at least partially premised on Nigro's reporting of safety concerns. *Id.* Finally, Nigro concludes that "[i]t is undisputed [Dr. Sadhasivam] has a discriminatory animus against women," as evinced, for example, by statements from others at IUHP that he "treats women differently" and "has a problem with women." *Id.* at 28. Moreover, "[i]t is also undisputed [Dr. Sadhasivam] made many complaints against [Nigro] and was pushing the other decision-makers to terminate [Nigro's] employment." *Id.*

In reply, IUHP contends that Nigro has "failed to identify any similarly-situated comparator who was treated more favorably" and that she "cannot demonstrate that IUHP's reasons for terminating her employment are pretext for sex discrimination." (Filing No. 57 at 2.) First, because Nigro has not shown that CAA 1 had a "comparable set of failings," he cannot serve as a

comparator. *Id.* Additionally, Nigro fails to show similar disruptive behavior by CAA 1 and how his alleged personal problems impacted his work. *Id.* at 2–3. In fact, "not only did Nigro fail to identify any <u>similar</u> conduct by [CAA 1], she failed to identify any misconduct by [CAA 1] that was <u>substantiated</u> by IUHP, and would justify discipline." *Id.* at 4 (citing *Marshall v. Ascension Health*, Case No. 1:17-cv-02211-JRS-DML, 2019 WL 3342137, *10 (S.D. Ind. Jul. 25, 2019); *Daigre v. City of Harvey*, Case No. 04 CV 4224, 2009 WL 2371727, *5 (N.D. Ill. Jul. 30, 2009)) (emphasis in original). Additionally, Dr. Green is an inappropriate comparator because he is an anesthesiologist who supervises anesthetists like Nigro, and the two did not "engage in similar conduct." *Id.* at 4–5. Unlike Nigro's unsupported objection to signing the prescribing order, Dr. Green "provided two letters to RAD leadership, explaining his concerns." *Id.* at 5. Moreover, two female anesthesiologists also objected, but Nigro failed to show that they were "threatened" or "disciplined." *Id.* IUHP points out that Nigro was not subject to any adverse action because of anything related to her initial refusal to sign the new practice protocol. The coaching memorandum mentioning her delay "was not an adverse employment action under Title VII," *id.* (citing *Davis v. Time Warner Cable of SE Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011)), and any "threat" of termination tracked the requirement that Nigro carry "required privileges" and "perform duties permitted by her licensing authority" to work for IUHP. *Id.*

IUHP also replies that Nigro has not shown that all the "proffered reasons for her termination are pretextual." *Id.* at 6. First, Nigro is the only person about whom [Dr.] Rescorla has ever written an incident report in his 30 plus years. *Id.* Dr. Sadhasivam recalls Dr. "Rescorla telling him that Nigro did not pay attention, and talked loudly and continuously in the operating room." *Id.* And even if Nigro disagrees "with IUHP's conclusions about her disputes with CAA[] Rush, [CRNA] Merritt and Chief Anesthetist Block[,] . . . IUHP's perception of her behavior, not

Nigro's perception of herself," controls. *Id.* at 7. Additionally, "Nigro has failed to provide any admissible evidence disputing Dr. Sadhasivam's genuine concern that Nigro's conduct undermined [Dr.] Acquaviva." *Id.*

IUHP notes that after issuing the coaching memorandum, it learned about multiple additional issues with Nigro's behavior, including her interaction with [Dr.] Dunlap, her interaction with [an MRI technician], and potential discrepancies in Nigro's time reporting. *Id.* Moreover, "praise for Nigro's clinical skills and overall helpfulness also does not save her claims" when her termination was based instead on "her disruptive conduct and contribution to an unhealthy environment among the RAD anesthetists." *Id.* at 9–10. In any event, Dr. Rescorla disagreed with these positive assessments, opining that "Nigro's skillset [was] in the 'lower 25 percent' of anesthetists." *Id.* at 10 (quoting Filing No. 53-6 at 11).

And IUHP argues that attempts to prove Dr. Sadhasivam and Block's discriminatory character—while mostly inadmissible hearsay—are too broad to even provide support. *Id.* at 10–12 (citing *Bordelon v. Board of Educ. of the City of Chicago*, 811 F.3d 984, 991 (7th Cir. 2016)). They are that Nigro's attempts to attack their reputations for honesty fail when "Nigro has failed to identify any evidence that either [Dr.] Sadhasivam or Block did not honestly believe all (or at least one of) the reasons given for Nigro's termination." *Id.* at 12. And though Nigro attempts to characterize the IUHP investigation of RAD as one driven by complaints of sex discrimination, "IUHP itself initiated a department-wide review to address murmuring and unrest within the RAD," which ultimately involved "complaints about [Dr.] Sadhasivam from both male and female employees." *Id.* at 13. Additionally, Nigro has provided no evidence that Block—a woman—"has any sex bias against other" women. *Id.* IUHP argues "the evidence is undisputed that [Nigro's] fellow anesthetists certainly did not trust her, and that such distrust was communicated to [Dr.]

Sadhasivam." *Id.* Indeed, "Nigro does not dispute that she secretly recorded her co-workers, rejected their invitations to socialize, and searched the internet for negative information about them, and cannot dispute that she appeared, to them, to be currying favor with the anesthesiologists at their expense." *Id.* Finally, as for any contention that Christopher acknowledged that Dr. Sadhasivam "treated [Drs.] Johnson, Latham and Hardacker differently because of their sex," that interpretation is misplaced when she instead recognized that this was a "belief" held by some, but her interviews revealed that "both men and women" took issue with leadership decisions. *Id.* at 14.

The Court finds that Nigro's claim fails under *McDonnell Douglas* because she has not identified a better-treated, similarly-situated comparator.[5] Ordinarily, "a plaintiff who believes another individual is 'similarly situated' must at least show that this 'comparator' (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (quotation omitted). Nigro focuses on the first two prongs in regard to CAA 1 as a comparator. She and he, as anesthetists, "performed the same duties, [were] supervised by the same anesthesiologists, [were] part of the same division, reported to the Director of the Anesthetists, and were bound by the same rules. However she neglects the third prong, failing to articulate how his conduct was similar to hers (Filing No. 52 at 24). "Comparators must have engaged in similar—not identical— conduct to qualify as similarly situated." *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012) (quotation omitted). "To determine whether two employees have engaged in similar misconduct,

---

[5] Because the Court resolves this claim before reaching the pretext question, it need not wade into the parties' competing contentions concerning Dr. Sadhasivam's and Block's reputations for honesty. *Cf. Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (pretext inquiry must focus on whether the employer's stated reason is honest, not well-reasoned, wise, or accurate). For the same reason, the Court need not evaluate whether statements in Christopher's declaration and Dr. Rescorla's email constitute hearsay inadmissible at summary judgment.

the critical question is whether they have engaged in conduct of comparable seriousness." *Id.* at 851 (quotation omitted). Nigro maintains that CAA 1 struggled with substance abuse problems that culminated in inattentive and dangerous work performance. She, on the other hand, was largely engaged in ongoing unprofessional behavior that disrupted the team-focused environment RAD was trying to implement. "While similarly situated parties need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quotation omitted). Nigro has not demonstrated that she and CAA 1 were "directly comparable" in "all material respects."

Regarding Dr. Green, not only is he an anesthesiologist under a separate supervisory chain of command with a scope of work and responsibilities wholly different than that of an anesthetist, he also was not engaged in similar conduct as Nigro. While both Nigro and Dr. Green showed reticence in signing the updated protocol (assuming that this hesitancy was even grounds for an adverse employment action against Nigro, who received the Coaching Memorandum in response[6]), Dr. Green provided well-bolstered statements supporting his stance compared to Nigro's bald tentativeness. And Nigro has provided no evidence that Dr. Green performed in any way to undercut the aspiration for creating a team environment at RAD.

---

[6] *See Davis v. Time Warner Cable of SE Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions.").

Using the *Ortiz* holistic approach, Nigro's claim fares no better.[7] Under *Ortiz*, the Court must determine "whether the evidence would permit a reasonable factfinder to conclude" that Nigro's sex "caused the discharge." 834 F.3d at 765. The record does not demonstrate that the decision to terminate Nigro was premised on her sex. Rather, it shows that IUHP terminated Nigro because she continually demonstrated behavior that undermined the collaborative environment that RAD was attempting to implement. Though Nigro points to the complaints of Drs. Latham, Johnson, and Hardacker against Dr. Sadhasivam based on his apparent mistreatment of women because of their gender, departmental review at RAD uncovered discontent with his interpersonal conduct across the board (Filing No. 51-3 at 11) ("The team as a whole expressed concerns about how they were all treated.")). In any event, Nigro ignores that the termination decision was not Dr. Sadhasivam's alone; indeed, four *women*—Hockaday, Bates, Christopher (who herself had been investigating Dr. Sadhasivam's behavior), and Prichard—agreed that Nigro's employment should be terminated based on legitimate workplace concerns. Nigro has presented no evidence that any supposed animus against women on the part of Dr. Sadhasivam tainted these female decisionmakers' ruminations. *Cf. Willis v. Marion Cty. Auditor's Off.*, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant."); *see also Fisher v. Vassar Coll.*, 114 F.3d 1332, 1338 (2d Cir. 1997), *abrogated on other grounds by Reeves v. Sanderson*

---

[7] To be sure, Nigro has not developed a "holistic" argument under *Ortiz, see Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n. 1 (7th Cir. 2004) (failure to develop an argument constitutes a waiver), and, in fact, argues the opposite, *see* Filing No. 52 at 23 ("The initial inquiry, even in light of *Ortiz*, is whether the plaintiff can establish a prima faci[e] case under the *McDonnell Douglas* test."). But "[h]owever the plaintiff chooses to proceed [in a discrimination case], at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of her [protected status]." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).

*Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ("Where . . . there are multiple recommenders or decision-makers, . . . each potentially [has] individual reasons for rejecting a plaintiff.").

And while some who worked with Nigro felt that she was a respectful and prepared anesthetist with good patient care (*see* Filing No. 53-1 at 4 (positive opinion of Dr. Johnson); Filing No. 58-3 at 2–3 (same of Dr. Green); Filing No. 58-4 at 5 (same of Dr. Kritzmire)), there was clearly not unanimity of praise (*see* Filing No. 51-8 at 12 (describing in physician complaint that Nigro "is always very rude and snappy and belittling"), 42 (detailing in email from Block to Dr. Sadhasivam the mounting distrust among Nigro's anesthetist peers); Filing No. 53-6 at 11 (deposition testimony of Dr. Rescorla describing Nigro's skillset as in the "lower 25 percent")), and the Court will not sit as a "super-personnel department" to weigh competing evaluations of her work or temperament. *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (7th Cir. 2012). Though the reasons for her termination may have been thinner than she would like, Nigro was, after all, terminated "without cause." (*See* Filing No. 51-1 at 69; Filing No. 54-2 at 6.)

Finally, the Court "mustn't forget that [Dr. Sadhasivam] requested that [Nigro] be hired in the first place, and did so with great enthusiasm." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) ("When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place?").  In sum, Nigro has not provided sufficient evidence to raise an issue of fact that she was terminated because of her sex.

For the preceding reasons, the Court **grants** IUHP's Motion for Summary Judgment as to Nigro's claim for sex discrimination under Title VII.

## C.    <u>Retaliation under Title VII</u>

Nigro alleges that IUHP "terminated [her] employment in retaliation of her protected activities" of "making complaints regarding gender discrimination and age discrimination to authorities at [IUHP] and the EEOC" and "assisting Dr. Kinsella reopen her federally protected gender discrimination case against" IUHP (Filing No. 1 at 7–8).  Title VII prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki*, 988 F.3d at 959 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) and citing *Ortiz*, 834 F.3d at 765). "[I]n other words, the plaintiff must prove that [she] engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord*, 839 F.3d at 563 (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)).

IUHP argues that Nigro has failed to demonstrate that she was retaliated against under Title VII for four reasons (Filing No. 50 at 32).  First, Nigro did not engage in protected activity of which decisionmakers were aware because "none of her complaints to HR or leadership mentioned age or sex discrimination,."   And Dr. Sadhasivam "was unaware" of the affidavit containing "allegations of age and sex discrimination" that was filed in the *Kinsella* case.  *Id.*  Second, she cannot identify any similarly-situated employee when no other anesthetist "caused the degree of disruption that" Nigro did.  *Id.* Third, she cannot demonstrate pretext because she "cannot genuinely dispute IUHP's honest belief about her impact on the RAD."  *Id.* at 32–33.  Finally, she fails to present evidence that shows "but-for" engaging in protected activity, "she would remain

employed" since, "as early as January 2019, [Dr.] Sadhasivam believed Nigro's behavior issues warranted termination, and by March and early April 2019, Christopher agreed with him." *Id.* at 33.

In response, Nigro argues that she "was engaged in a protected activity when she filed her original EEOC complaint and participated in the Kinsella case by signing an affidavit on April 29, 2019 to support the re-opening of her case." (Filing No. 52 at 29.) And "[t]here is no dispute IUHP had knowledge of [Nigro]'s protected activity." *Id.* IUHP's attorney represented the company in both this and the *Kinsella* case and received a copy of Nigro's EEOC complaint, so knowledge to IUHP is imputed through her awareness of the protected activity. *Id.* at 29–30 (citing *Washington v. Parkinson*, 737 F.3d 470, 473 (7th Cir. 2013)). In fact, following her and "Dr. Kritzmire's participation in the Kinsella case, [Nigro] was terminated and Dr. Kritzmire was placed on a Performance Improvement Plan ('PIP')." *Id.* at 30. Nigro argues the link between IUHP's actions against her and Dr. Kritzmire are more than mere suspicion. A mere 13 days after Dr. Kritzmire filed her supplemental affidavit [Nigro] was terminated and Dr. Kritzmire disciplined. *Id.*

IUHP replies that Nigro has failed to dispute its honest belief that she was creating an unhealthy environment in the RAD, based on information provided by multiple sources. (Filing No. 57 at 14.) First, Dr. "Sadhasivam cannot retaliate against Nigro for engaging in protected activity of which he is unaware," and he had no actual knowledge of Nigro's affidavit filed in *Kinsella*. *Id.* at 14–15 (citing *Emerson v. Dart*, 900 F.3d 469, 472–73 (7th Cir. 2018) (summarizing case as holding that "adverse actions 'count as retaliation only if [actors] had actual knowledge of' protected activity")). Moreover, Nigro has not demonstrated that Dr. "Sadhasivam was aware that she had contacted the EEOC." *Id.* at 15. In fact, "Nigro admits she never told any IUHP leader or

32

HR that she experienced sex discrimination." *Id.*  Finally, though "Nigro also appears to argue that, because [Dr.] Sadhasivam issued a [PIP] to [Dr.] Kritzmire close in time to [Dr.] Kritzmire's submission of an affidavit in the *Kinsella* case," she failed to demonstrate that Dr. Sadhasivam knew Dr. Kritzmire had submitted an affidavit, let alone any "connection between [Dr.] Kritzmire's performance issues and herself." *Id.*

The Court again agrees with IUHP. To show the requisite causal connection, Nigro primarily relies upon the timing between when she and Dr. Kritzmire engaged in statutorily protected activity (signing and submitting affidavits in the *Kinsella* case on April 29, 2019 and June 11, 2019, respectively) and when she suffered an adverse employment action (her termination on June 24, 2019). Under caselaw in this circuit, "[s]uspicious timing is rarely enough to create a triable issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). So "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument," courts "typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). The two-month gap between Nigro's protected activity and her termination, then, cannot show retaliation on its own. *Cf. Lord*, 839 F.3d at 564 (drawing causal connection from a two-day period between protected activity and termination). And though she notes that Dr. Kritzmire filed her affidavit in *Kinsella* nearer Nigro's termination, Nigro does not articulate why any protected activity on the part of Dr. Kritzmire could lead to retaliation against Nigro.

Of course, additional evidence could fortify Nigro's assertion of a causal connection based on suspicious timing, but she provides none. "When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may 'survive summary judgment if there is other evidence that supports the inference of a causal link.'" *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir.

2019) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).  Nigro provides no other evidence supporting an inference of a causal link.  She fails to rebut that, before she was terminated, Dr. Sadhasivam and the four female decisionmakers did not know about the *Kinsella* affidavit (or that they knew she had contacted the EEOC or otherwise engaged in any protected activity). She concedes that she never told any IUHP leader or HR that she had experienced sex discrimination, let alone that she had contacted the EEOC.  *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566 (7th Cir. 2019) (holding that "even if Mr. Cervantes has alleged that he engaged in protected activity, his retaliation claim still fails because he conceded that none of his supervisors at Ardagh were aware of his complaints").  Because Nigro has failed to demonstrate any causal connection between engaging in a protected activity and an adverse employment action, the Court **grants** IUHP's Motion for Summary Judgment as it pertains to that claim.

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** IUHP's Motion for Summary Judgment (Filing No. 49).  The Court also **GRANTS** Nigro's Motion for Leave to File a Surreply Brief and Corrected Affidavits (Filing No. 58).  As this Entry resolves all claims in this case, Final Judgment will issue under separate order.

**SO ORDERED.**

Date: 9/1/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Robert E. Saint
EMSWILLER WILLIAMS NOLAND & CLARKE
rsaint@ewnc-law.com

Bonnie L. Martin
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
bonnie.martin@ogletree.com